**UNITED STATES of America,**
**Appellee,**

v.

**Christopher MEADE, Defendant,**
**Appellant.**

**No. 98–1905.**

United States Court of Appeals,
First Circuit.

Heard April 6, 1999.

Decided May 11, 1999.

---

*Leo T. Sorokin,* Federal Defender Office, for appellant.

*Jennifer Zacks,* Assistant United States Attorney, with whom *Donald K. Stern,* United States Attorney, was on brief, for appellee.

Before: Selya, Boudin and Stahl, Circuit Judges.

SELYA, Circuit Judge.

This appeal requires us to address questions of first impression concerning the construction and constitutionality of two recently-enacted federal firearms laws, 18 U.S.C. § 922(g)(8) and 18 U.S.C. § 922(g)(9), both of which were intended to help curb the escalating societal problems associated with domestic violence. We conclude that these statutory provisions withstand the appellant's vigorous challenge.

**I**

In the early morning hours of May 16, 1997, defendant-appellant Christopher Meade began pounding on the door of his estranged wife's apartment in Lynn, Massachusetts, threatening to shoot her. When police arrived, they discovered a number of persons, including Meade himself, gathered outside the dwelling. The officers instructed all those at the scene to lie face down and display their hands. Instead of obeying, Meade crouched by the side of a parked car and thrust his hand into it. The police later retrieved a loaded handgun from the automobile. Neither the handgun nor the ammunition had been manufactured in Massachusetts.

A recently-enacted federal law makes it a crime for a person who is subject to a judicial anti-harassment or anti-stalking order to possess firearms that have been shipped or transported in interstate commerce. *See* 18 U.S.C. § 922(g)(8) (quoted *infra* note 3). Another recently-enacted federal law makes it a crime for a person who has committed a "misdemeanor crime of domestic violence" to possess such a

weapon. *See* 18 U.S.C. § 922(g)(9). Meade ran afoul of both proscriptions: on May 16, 1997, he had a prior misdemeanor conviction for assaulting his spouse, and he was subject to a state court restraining order, issued pursuant to Mass. Gen. Laws ch. 209A, prohibiting contact with her. Consequently, the United States charged Meade with having violated sections 922(g)(8) and (9). A jury found him guilty on both counts and the district court imposed a 78–month incarcerative sentence. Meade now appeals.

## II

■ Defying numerical order, we start with 18 U.S.C. § 922(g)(9). In relevant part, this statute renders it "unlawful for any person ... who has been convicted in any court of a misdemeanor crime of domestic violence" to possess "any firearm or ammunition ... which has been shipped or transported in interstate or foreign commerce." The appellant, whose only potential predicate offense is a misdemeanor conviction under a general assault and battery statute, Mass. Gen. Laws ch. 265, § 13A, claims that the district court erred in treating that conviction as a "misdemeanor crime of domestic violence" within the purview of 18 U.S.C. § 922(g)(9).

The linguistic hook upon which Meade fastens this claim appears in an ancillary definitional statute, 18 U.S.C. § 921(a)(33)(A), which characterizes a "misdemeanor crime of domestic violence" as an offense that is a misdemeanor under state law, *see id.* § 921(a)(33)(A)(i), and which "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim," *id.* § 921(a)(33)(A)(ii). Meade acknowledges

that his prior conviction satisfies the first criterion (i.e., it was for a misdemeanor), but insists that it fails to satisfy the second criterion because the underlying statute does not have *as an element* the relationship status between misdemeanant and victim. As the appellant sees it, the only crimes that fit within the quoted language (and, thus, the only crimes that may serve as predicate offenses for purposes of section 922(g)(9)) are those which, as part of their formal definition, require a showing of both the mode of aggression (e.g., the use of a weapon) and the assailant's relationship status (e.g., spouse). The district court rejected this exercise in statutory interpretation, *see United States v. Meade*, 986 F.Supp. 66, 68 (D.Mass.1997), and so do we.

Meade's argument depends on the answer to the following question: Did Congress intend that only misdemeanors which include the relationship status as an element within their formal definition would count as predicate offenses under section 922(g)(9)? Our search for this answer must begin with the language that Congress used in crafting the statutory scheme. *See United States v. Charles George Trucking Co.*, 823 F.2d 685, 688 (1st Cir.1987). That perspective focuses our attention on the word "element" in the text of section 921(a)(33)(A)(ii). This singular noun is followed not by one, but by two conceptually distinct attributes: the mode of aggression and the perpetrator's relationship to the victim. Meade's gloss on the reach of the word "element" indiscriminately conflates the two.

■ We reject this gloss. In construing statutes, courts should presume, absent contrary evidence, that Congress knew, and meant to adopt, the background legal concepts associated with the words that it chose to incorporate into a law. *See Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 827 (1st Cir.1992). The word "element" fits into this category. It is singu-

lar, and, absent evidence that Congress wished to deviate from customary usage, it should be read to refer only to the immediately following attribute. Since no such evidence exists, we conclude, without serious question, that only the mode of aggression, not the relationship status between perpetrator and victim, must appear within the formal definition of an antecedent misdemeanor to constitute it as a predicate offense.

■ We could well end our interpretive inquiry at this juncture. When, as now, the plain language of a statute unambiguously reveals its meaning, and the revealed meaning is not eccentric, courts need not consult other aids to statutory construction. *See Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469, 474, 139 L.Ed.2d 352 (1997); *Charles George Trucking,* 823 F.2d at 688. From time to time, however, courts (perhaps manifesting a certain institutional insecurity) employ such secondary sources as a means of confirmation. *See, e.g., Negonsott v. Samuels,* 507 U.S. 99, 106–09, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993); *Mullin v. Raytheon Co.,* 164 F.3d 696, 702–03 (1st Cir.1999); *Barker v. United States Dep't of Labor,* 138 F.3d 431, 436 (1st Cir.1998). In this instance, such an exercise removes any lingering doubt.

The statute's legislative history is particularly helpful in this regard. In describing the interrelationship between section 922(g)(9) and other gun-control laws on the Senate floor, the legislation's chief sponsor noted presciently that "convictions for domestic violence-related crimes often are for crimes, such as assault, that are not explicitly identified as related to domestic violence." 142 Cong. Rec. S11878 (1996) (statement of Sen. Lautenberg). For this reason, he urged local law enforcement authorities administering gun registration provisions "to thoroughly investigate misdemeanor convictions on an applicant's criminal record to ensure that none involves domestic violence, before allowing the sale of a handgun." *Id.* These statements, made by the principal architect of

the bill before final passage, clearly demonstrate Congress's threshold understanding that "misdemeanor crime[s] of domestic violence" would not be limited to those in which the relationship status was included as a formal element of the statute of conviction.

■ There are, of course, limitations on the extent to which courts appropriately may rely on the statements of individual legislators to color the meaning of statutory language. *See, e.g., Regan v. Wald,* 468 U.S. 222, 237, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984). Withal, contemporaneous statements by a sponsor, although far from conclusive, are generally entitled to respect. *See North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 526–27, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982); *FEA v. Algonquin SNG, Inc.,* 426 U.S. 548, 564, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976). Moreover, in analyzing legislative history, specificity breeds credibility; thus, particularized explanations of how specific provisions of an act are meant to work have been deemed more instructive than generalized pronouncements anent statutory purpose. *See Regan,* 468 U.S. at 237, 104 S.Ct. 3026 (recognizing that statements made in floor debates may be persuasive as to Congress's intent when they are "very precisely directed to the intended meaning of particular words in a statute"). The statements we have quoted are of this genre. Perhaps most important, Senator Lautenberg's comments are perfectly consistent with the statutory language and the general purpose of the legislation, and promote a logically and linguistically coherent exegesis of the provision here at issue. They therefore reinforce the construction to which we are led by the plain meaning of the statutory text. *See Brock v. Pierce County,* 476 U.S. 253, 263, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) (noting that statements in floor debates evidence legislative intent when they are consistent with statutory language and other legislative history).

We note, too, that plain language can be made more (or less) compelling by a frank consideration of possible alternatives. Reading section 922(g)(9) in the manner that the appellant advocates would lead to a significant practical anomaly and would frustrate the clear purpose behind the law, which contemplated that the ban on firearms possession would apply broadly to all those falling into the relevant categories. *See* 18 U.S.C. § 922(g)(9) (making it "unlawful for *any* person ... who has been convicted in *any* court of a misdemeanor crime of domestic violence" to possess "*any* firearm or ammunition") (emphasis supplied); *see also Barrett v. United States,* 423 U.S. 212, 218, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976) (remarking, in the course of interpreting 18 U.S.C. § 922, that its "very structure ... demonstrates that Congress ... sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous"). Fewer than half the states have misdemeanor statutes that formally include relationship status as an element of a misdemeanor domestic assault offense. Others, like Massachusetts, rely on general misdemeanor statutes to accomplish the same ends. Thus, the appellant's interpretation of section 922(g)(9) would render the statute a dead letter in most jurisdictions—an outcome that Congress hardly could have intended. This lack of congruence strengthens the pull of plain language; courts, after all, should not strain to reach results that inhibit the uniform and consistent application of a federal criminal statute.

The appellant counters this statutory analysis with an array of asseverations, none of which we find persuasive. First, he maintains that had Congress intended not to require relationship status to be a formal element of a misdemeanor crime of domestic violence, it could have written the law differently (to say, for instance, that such a crime is an offense that "has, as an element" the use of force or a weapon, "and was committed by" someone within a relevant relationship). But Congress is not required to draft statutes in ways that are precise to the point of pedantry. As long as a statute, as written, is reasonably clear and does not lead to absurd outcomes, courts should construe it according to its tenor. *See Salinas,* 118 S.Ct. at 474; *Negonsott,* 507 U.S. at 104, 113 S.Ct. 1119; *Charles George Trucking,* 823 F.2d at 688. In all events, Meade's counterfactual does nothing to bolster his problematic interpretation of the statute.

Next, the appellant directs our attention to several statutes—including solicitation and sentence-enhancement laws—in which Congress has employed a more or less comparable linguistic structure that defines a "crime of violence" as an offense that "has as an element" the use or threatened use of force or of a deadly weapon against the person or property of another. *See, e.g.,* 18 U.S.C. §§ 16(a), 373(a), 521(c)(2), 924(c)(3)(A), 924(e)(2)(B)(i), 3156(a)(4)(A), 3559(c)(2)(F)(ii). In the appellant's view, such statutes routinely collapse the mode and object of aggression into a single element, and, thus, suggest that section 921(a)(33)(A)(ii) should be construed to encompass both mode of aggression and relationship status under the "element" rubric. It is true, of course, that Congress's use of parallel language and construction in different statutes may at times inform judicial interpretation. *See Irving v. United States,* 162 F.3d 154, 163 (1st Cir.1998) (en banc); *Greenwood Trust,* 971 F.2d at 827. Here, however, three flaws mar the fabric of the appellant's construct.

■ First, Congress has made manifest its intent, and there is no need to resort to other aids (including other statutes) for assistance in the interpretive process. *See Norfolk & W. Ry. Co. v. American Train Dispatchers' Ass'n,* 499 U.S. 117, 129, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) (declining to resort to a canon of construction that supported a particular interpretation of a statute when the "whole context," including the statute's plain language, "dic-

tate[d] a different conclusion"). Second, precedent teaches that the case for construing one statute in a manner similar to another is weakest when the two have significant differences, *see, e.g., United States v. Granderson*, 511 U.S. 39, 50–51, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994), and, here, the appellant seeks to compare plums with pomegranates. Section 922(g)(9) has a distinct, focused, and singular purpose that is not covered by any of the other statutes that Meade identifies. This, combined with the fact that Meade's proposed interpretation completely frustrates congressional intent, is more than sufficient to defeat his tendered comparison and consign his argument to the scrap heap. *See Granderson*, 511 U.S. at 50–51, 114 S.Ct. 1259. Last, but not least, the appellant's interpretation is open to serious question; the statutes that he advertises as fair congeners seem somewhat less than that. *Cf. Taylor v. United States*, 495 U.S. 575, 600, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990) (discussing 18 U.S.C. § 924(e)(2)(B)(i) and identifying only "the use or threat of force" as textually linked to "has as an element"). In sum, because the misdemeanant-in-possession statute is unambiguous and does not parallel the proffered provisions in substance, or in purpose, or, ultimately, in language, we refuse to follow Meade's excursion into comparative analysis.

The appellant has a fallback position. He notes that courts by and large have taken a so-called categorical approach in construing statutes and sentencing guidelines that incorporate "predicate offense" concepts. *See, e.g., Taylor*, 495 U.S. at 600–01, 110 S.Ct. 2143 (construing 18 U.S.C. § 924(e)); *United States v. Winter*, 22 F.3d 15, 18 (1st Cir.1994) (construing USSG § 4B1.1). From this, Meade concludes that only state statutes that include relationship status as an element of the formal definition of a domestic violence misdemeanor may be considered predicate offenses for purposes of 18 U.S.C. § 922(g)(9). This argument fundamentally misapprehends the problem that the categorical approach addresses.

The task before the *Taylor* Court was to determine the precise meaning of the term "burglary" as used in a sentence-enhancement statute, 18 U.S.C. § 924(e). After reviewing the relevant legislative history, the Court determined that Congress meant the term to carry a generic definition. *See Taylor*, 495 U.S. at 589–90, 110 S.Ct. 2143. Having established Congress's intent with respect to the meaning of the word "burglary"—the crime that Congress had specified as a predicate offense—the *Taylor* Court then proceeded to consider a logically posterior question: Could prosecutors seek enhancements for convictions that had been obtained under statutes that encompassed both burglary and other crimes (not themselves eligible to serve as sentence enhancers)? *See id.* at 599–600, 110 S.Ct. 2143. This question raised a broader issue as to whether courts should look to statutory definitions of prior offenses or to the defendant's underlying acts in order to determine whether a prior conviction might be considered a predicate offense for sentence-enhancement purposes. *See id.* The Court responded with a preference for a categorical approach that would focus primarily on formal definitions. *See id.* at 600–01, 110 S.Ct. 2143.

The *Taylor* Court's sequencing of the two inquiries that we have described explodes Meade's argument. Before engaging in a categorical approach, one first must have established the formal definition of the particular predicate offense, a process that necessarily requires determining the requisite elements of the statute of conviction. The appellant's attempt to establish the formal definition of a "misdemeanor crime of domestic violence" by direct resort to a categorical approach thus puts the cart before the horse.[1]

---

1. In his effort to convince us to sanction a categorical approach, Meade uses scare tactics. He proclaims, with appropriate rhetorical flourishes, that, unless relationship status

■ The appellant next contends that section 922(g)(9) is unconstitutionally vague because it does not define the offense with sufficient clarity that an ordinary person can ascertain whether his actions would fall within its proscriptions. We reject this contention out of hand. Criminal statutes are unconstitutionally vague if they do not adequately specify the conduct that they prohibit or the class of persons to whom they apply. *See, e.g., United States v. Lanier*, 520 U.S. 259, 265–66, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997); *Bouie v. City of Columbia*, 378 U.S. 347, 350–51, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). Here, the statute *sub judice* contains no ambiguity either as to the persons to whom the prohibitions apply or as to what conduct is proscribed. Nor does the appellant's contention that a misdemeanant convicted under a general statute will not know whether his conviction will count as a predicate offense alter the calculus. It is, after all, fair to presume that a misdemeanant will know his relationship with his victim.

■ As a final matter, the appellant argues that the rule of lenity should weigh in his favor. The rule of lenity has bearing only if, after a full examination of a particular statute, an inquiring court must guess at what Congress intended. *See Holloway v. United States*, —— U.S. ——, —— n. 14, 119 S.Ct. 966, 972 n. 14, 143 L.Ed.2d 1, —— n. 14 (1999); *United States v. O'Neil*, 11 F.3d 292, 301 n. 10 (1st Cir.1993). In this instance, Congress's intent is clear. Consequently, the rule of lenity is inapposite.

### III

■ Those convicted of misdemeanors in Massachusetts do not automatically lose their civil rights upon conviction. *See United States v. Indelicato*, 97 F.3d 627, 629 (1st Cir.1996). So it was with Meade who, upon being convicted of misdemeanor assault and battery against his spouse, was sentenced to probation. However, Meade subsequently lost one of his civil rights—the right to sit on a jury—when he was incarcerated after having violated his probation. *See* Mass. Gen. Laws ch. 234A, § 4(7) (prohibiting jury service while incarcerated). Because that disability ended when Meade's immurement ended, he asseverates that his civil rights were "restored," and that, therefore, his misdemeanor conviction should not qualify as a predicate offense for purposes of 18 U.S.C. § 922(g)(9). *See id.* § 921(a)(33)(B)(ii) (stating, *inter alia*, that a conviction does not count as a misdemeanor crime of domestic violence if the offender, after losing his civil rights on that account, has had them restored).

A major, and dispositive, problem with this asseveration is that the appellant has waived it and, accordingly, there is no error to review. *See United States v. Olano*, 507 U.S. 725, 732–33, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *United States v. Mitchell*, 85 F.3d 800, 807–08 (1st Cir. 1996). The record shows that, toward the close of the government's case in chief, Meade's counsel noted his client's willingness to stipulate that "prior to May 15th [Meade] was convicted of a misdemeanor assault and battery, which is a misdemeanor crime of domestic violence, and ... to agree ... that the jury will be instructed they will accept that element as found." Counsel placed only a single qualification on this stipulation, reserving for appeal the legal question discussed in Part II of this opinion, namely, whether section 922(g)(9) required that misdemeanor crimes of domestic violence must include the necessary relationship status as an element before those crimes can qualify as predicate offenses. The government acquiesced in the stipulation and the condition, as did the

---

is deemed a part of the formal definition of the predicate offense, factfinding will be a "nightmare." This shark has no teeth. Federal criminal trials typically involve proof and differential factfinding, and the issue of relationship status is by no means outside a jury's competence.

district court. The trial proceeded on that basis.

 As a general matter, a criminal defendant who stipulates to an element of an offense relinquishes his right to test the government's case with respect to the existence of the facts underlying that particular. *See United States v. Hardin,* 139 F.3d 813, 816 (11th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 225, 142 L.Ed.2d 185 (1998); *United States v. Melina,* 101 F.3d 567, 572 (8th Cir.1996); *United States v. Muse,* 83 F.3d 672, 678 (4th Cir.1996). Thus, Meade cannot now challenge the fact of his misdemeanor conviction. The slightly more difficult question is whether a stipulation as to facts also functions as a waiver of legal defenses to the establishment of the particular element to which the parties have stipulated. We believe that it does.

To assert that a stipulation to an element of a crime does not affect legal defenses is to build an artificial wall between factual and legal arguments. The prosecution's successful establishment of an element of a crime does not invariably depend on showing merely that a certain set of facts exist; there are often legal barriers to scale as well. This case illustrates the point: establishing the predicate misdemeanor crime of domestic violence hinged not only on producing an official record attesting to an underlying conviction, but also on overcoming whatever legal defenses Meade mounted in regard to the materiality of that conviction. Given that reality, and given the corollary fact that criminal defendants frequently gain strategic benefits from entering into stipulations, *see, e.g., Old Chief v. United States,* 519 U.S. 172, 174, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *United States v. Tavares,* 21 F.3d 1, 4–5 (1st Cir.1994) (en banc), common sense suggests that the decision to forgo a

defense with respect to a particular element involves more than an assessment of whether the relevant facts can successfully be disputed. It follows that when a defendant affirmatively agrees not to put the government to its proof of an element of a crime, a court may presume, in the absence of an express reservation, that the defendant has considered all of his available options, factual and legal, and determined that the better course is to allocate his energies elsewhere. *See Melina,* 101 F.3d at 572 (holding that defendant's stipulation to the interstate commerce element of 18 U.S.C. § 844(i) constituted a "complete waiver of the issue"); *United States v. Clark,* 993 F.2d 402, 405–06 (4th Cir. 1993) (holding that defendant's stipulation that the predicate offense element under 18 U.S.C. § 922(g) had been satisfied "relieved [the government] of any obligation of proving any aspect of that element, including the aspect that the defendant's civil rights had not been restored"); *cf. United States v. Broce,* 488 U.S. 563, 569–74, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989) (holding that a defendant who pleads guilty unconditionally thereby relinquishes his entitlement to challenge either the facts or the legal theories supporting the charge).

 This rule governs here. There was not the slightest indication at any point in the proceedings below that Meade intended to raise or preserve any legal defenses apart from his "relationship status" defense. To the precise contrary, the totality of the circumstances (especially Meade's stipulation to the predicate offense, his acquiescence in the jury instructions that followed, and his affirmative preservation of a different legal defense) compels a determination that Meade relinquished all other defenses, factual and legal, pertaining to the stipulated element.[2]

2. In concluding here that stipulation to an element functions as a waiver of legal defenses, we express no opinion on whether the government's duty to prove each element of a crime beyond a reasonable doubt is diluted

impermissibly if the jury instructions do not submit the stipulation for the jury's consideration. This thorny question has divided the courts of appeals, *compare Muse,* 83 F.3d at 679–80 (holding that the district court may

We therefore rebuff Meade's suggestion that his newly-minted restoration of rights defense was left open by the parties, *sub silentio*, to be addressed at a later date. That defense was waived. *See United States v. Valenzuela*, 150 F.3d 664, 667–68 (7th Cir.1998) (finding waiver when defendant could have preserved his rights to a legal defense in connection with his factual admission anent drug sales, but failed to do so). And since waived defenses, unlike forfeited defenses, are not amenable to plain-error review, the only other thing that need be said is that, taken to its logical conclusion, the same waiver analysis dooms Meade's argument, advanced for the first time in this venue, that the restoration of rights provision violates the Equal Protection Clause. *See United States v. Bongiorno*, 106 F.3d 1027, 1034 (1st Cir.1997) (holding that a party may waive questions of constitutional dimension).

## IV

Having repulsed the appellant's attacks on 18 U.S.C. § 922(g)(9), we turn now to 18 U.S.C. § 922(g)(8). Meade raises two constitutional challenges to this provision.

██ First, Meade asserts that section 922(g)(8) affronts the Tenth Amendment, U.S. Const. amend. X, because it promotes interference by the federal government in state civil proceedings. The United States responds that the statute requires proof, in each and every case, that the firearm in question was transported or sold in interstate commerce. *See infra* note 3. Thus, the government reasons, enactment of the statute falls within Congress's regulatory power under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3.

██ The Tenth Amendment reserves to the states all powers not vested by the Constitution in the federal sovereign. *See Printz v. United States*, 521 U.S. 98, 117 S.Ct. 2365, 2376–77, 138 L.Ed.2d 914 (1997). It is settled beyond peradventure that if Congress properly acts pursuant to one of its enumerated powers, its work product does not offend the Tenth Amendment. *See Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). The question, then, is whether the enactment of section 922(g)(8) represents a valid exercise of congressional authority under the Commerce Clause.

It is true, as the government observes, that courts regularly have upheld the use of a case-by-case jurisdictional element, such as imbues this statutory scheme, as a means of satisfying the required nexus with interstate commerce, and, thus, bringing federal legislation within the shelter of the Commerce Clause. *See, e.g., United States v. Cunningham*, 161 F.3d 1343, 1345–47 (11th Cir.1998); *United States v. Pierson*, 139 F.3d 501, 502–03 (5th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 220, 142 L.Ed.2d 181 (1998); *United States v. Joost*, 133 F.3d 125, 131 (1st Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 1545, 140 L.Ed.2d 693 (1998). But Meade casts his argument at a slightly different angle. He notes that section 922(g)(8) is separate and apart from the jurisdictional element that underlies the whole of section 922(g), and ruminates that section 922(g)(8) *in and of itself* represents an undue imposition on state sovereignty.[3]

---

not remove a stipulated element from the jury's consideration), and *United States v. James*, 987 F.2d 648, 650–51 (9th Cir.1993) (similar) *with United States v. Mason*, 85 F.3d 471, 472–73 (10th Cir.1996) (holding that the right to have the jury decide each element is waived when the defendant enters into a stipulation), but it is not raised in the instant case.

**3.** The statute provides in pertinent part:

(g) It shall be unlawful for any person—
\* \* \*
(8) who is subject to a court order that—
(A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
(B) restrains such person from harassing, stalking, or threatening an intimate partner of such person . . . , or engaging in other conduct

This proposition is simply incorrect. Section 922(g)(8) does not in any way intrude upon state court proceedings, or upon the authority of a state or its agents to administer their domestic relations laws in the manner they see fit. Stripped to bare essence, section 922(g)(8) makes the existence of a state court order an element of a federal misdemeanant-in-possession offense—no more and no less. Nothing in the state court proceeding changes on account of, or is in any way affected by, the operation of the federal law. Thus, section 922(g)(8) is totally devoid of Tenth Amendment implications. *See Bongiorno,* 106 F.3d at 1033–34 (holding that the federal Child Support Recovery Act did not violate the Tenth Amendment because it came "into play only after a state court issue[d] a child support order," and it did "not authorize a federal court to revise the underlying decree").

▮▮ Next, Meade maintains that section 922(g)(8) violates the Due Process Clause because it does not mandate that state court restraining orders inform those whom they enjoin of the federal law consequences that may attach.[4] The issue of notice, in the constitutional sense, customarily centers around whether a law explains with sufficient clarity the conduct that it purports to criminalize. *See, e.g., Bouie,* 378 U.S. at 350–51, 84 S.Ct. 1697. In the case of section 922(g)(8), the statute satisfies the standards embedded in precedent; both the proscribed conduct and the affected class of persons are explicitly set forth. *Accord United States v. Wilson,* 159 F.3d 280, 288 (7th Cir.1998), *petition*

*for cert. filed* (Mar. 29, 1999) (No. 98–8724).

The appellant attempts to put a spin on the notice argument by touting *Lambert v. California,* 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957). *Lambert* represents one of the relatively rare instances in which the Supreme Court has concluded that, contrary to the well-established tenet, actual knowledge of the law's requirements is a precondition to criminal liability (and, therefore, ignorance of the law will excuse the defendant). *See id.* at 228–29, 78 S.Ct. 240. Specifically, the *Lambert* Court held that a law which imposed strict liability upon convicted felons for mere presence in a municipality was constitutionally infirm because, without forewarning, it punished conduct that a reasonable person ordinarily would not consider to be criminal. *See id.; see also United States v. Freed,* 401 U.S. 601, 608, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (explaining *Lambert* and noting that "[b]eing in Los Angeles is not per se blameworthy").

A significant problem with this aspect of the appellant's argument is that the Court has steadfastly resisted efforts to extend *Lambert*'s reach, *see, e.g., id.* at 609, 91 S.Ct. 1112 (declining to extend *Lambert* to possession of hand grenades), and has gone so far as to suggest that the *Lambert* dissent correctly characterized the majority opinion as "an isolated deviation from the strong current of precedents—a derelict on the waters of the law." *Texaco, Inc. v. Short,* 454 U.S. 516, 537 n. 33, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982). Thus, any attempt to introduce *Lambert* into

---

that would place an intimate partner in reasonable fear of bodily injury . . . ; and

(C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner . . . ; or

(ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner . . . that would reasonably be expected to cause bodily injury;

\* \* \*

to ship or transport in interstate or foreign commerce, or possess in or affecting

commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

4. We note in passing that irony is no stranger to the law: Meade, after arguing that section 922(g)(8) infracts the Tenth Amendment, now posits that it is unconstitutional because it does not require state judges fully to include federal law ramifications in their restraining orders in domestic proceedings.

new environs must be viewed with great circumspection.[5]

Meade nevertheless tries to bring his case within the *Lambert* exception by arguing that firearms possession is an act sufficiently innocent that no one could be expected to know that he would violate the law merely by possessing a gun. As *Staples v. United States,* 511 U.S. 600, 610–12, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), makes clear, firearms possession, without more, is not a kind of activity comparable to possession of hand grenades, *see Freed,* 401 U.S. at 609, 91 S.Ct. 1112, narcotics, *see United States v. Balint,* 258 U.S. 250, 253–54, 42 S.Ct. 301, 66 L.Ed. 604 (1922), or child pornography, *see United States v. Robinson,* 137 F.3d 652, 654 (1st Cir.1998). But possession of firearms by persons laboring under the yoke of anti-harassment or anti-stalking restraining orders is a horse of a different hue. The dangerous propensities of persons with a history of domestic abuse are no secret, and the possibility of tragic encounters has been too often realized. We think it follows that a person who is subject to such an order would not be sanguine about the legal consequences of possessing a firearm, let alone of being apprehended with a handgun in the immediate vicinity of his spouse. *Accord United States v. Bostic,* 168 F.3d 718, 722–23 (4th Cir.1999); *Wilson,* 159 F.3d at 288–89; *cf. Tart v. Massachusetts,* 949 F.2d 490, 503 (1st Cir.1991) (rejecting a *Lambert* challenge to a state commercial fishing permit requirement).

In short, we do not believe that the prohibition of section 922(g)(8) involves conduct and circumstances so presumptively innocent as to fall within the narrow confines of the *Lambert* exception. We therefore reject the appellant's contention that the statute, on its face, violates due process rights of notice.

**V**

We need go no further. The first of the firearms statutes at issue here—18 U.S.C. § 922(g)(9)—is by no means a model of draftsmanship, but the appellant's gloss upon it cannot be sustained by any reasonable method of statutory interpretation. The second statute, 18 U.S.C. § 922(g)(8), easily withstands the appellant's multifarious constitutional attacks.

*Affirmed.*

**5.** For the sake of completeness, we note that although *Lambert* has, in effect, been limited to its rather distinctive facts, the Court at times has reached a similar result by means of statutory interpretation (as opposed to due process). *See, e.g., Ratzlaf v. United States,* 510 U.S. 135, 149, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994); *Cheek v. United States,* 498 U.S. 192, 200–01, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). In this case, however, such a route is unavailable to the appellant; it simply does not appear plausible that Congress intended section 922(g)(8) to carry a mens rea requirement of actual knowledge of the law. Indeed, the Court recently reaffirmed its hoary understanding that where, as here, Congress employs a "knowing" standard of culpability, *see* 18 U.S.C. § 924(a)(2), such a word choice normally signifies that the government needs to prove only that the defendant knew of the facts comprising the offense, and nothing more. *See Bryan v. United States,* 524 U.S. 184, 118 S.Ct. 1939, 1945–46, 141 L.Ed.2d 197 (1998).