STATE OF NORTH CAROLINA v. RICKY NEAL YOUNG

No. COA99-843

(Filed 5 September 2000)

**Constitutional Law; Sexual Offenses— registration of sex offenders—defendant adjudicated incompetent**

N.C.G.S. § 14-208.11, which requires sex offenders to register their address, is unconstitutional as applied to an adjudicated incompetent defendant because it fails to afford sufficient notice under the Fifth and Fourteenth Amendments. Although the defendant here was provided with sufficient actual notice to satisfy due process requirements for any reasonable and prudent man, defendant has been legally determined to be incapable of managing his own affairs and is not a reasonable and prudent man. Due to the nature of this statute's requirement and the wholly innocent act through which it may easily be violated, proof of an adjudicated incompetent defendant's ability to comply with this statute must necessarily be an element of the State's prima facie case, and a test for determining competency to stand trial is substantially different from one which would determine whether defendant was competent to comply with the requirements of this statute.

Judge HORTON concurs in the result.

Appeal by defendant from judgment entered 18 December 1998 by Judge James L. Baker, Jr. in Buncombe County Superior Court. Heard in the Court of Appeals 16 May 2000.

1

IN THE COURT OF APPEALS

*Attorney General Michael F. Easley, by Assistant Attorney General John J. Aldridge, III, for the State.*

*Michael E. Casterline for defendant-appellant.*

HUNTER, Judge.

Ricky Neal Young ("defendant") appeals the jury verdict convicting him of failing to register his change of address as a sex offender, in violation of N.C. Gen. Stat. § 14-208.11. Finding this statute to be unconstitutional as applied to this defendant, an adjudicated incompetent, we reverse his conviction.

The record before us reveals that on 7 July 1989 defendant was adjudicated incompetent and his mother, Patsy Riddle ("Ms. Riddle") was appointed his guardian. In 1991, defendant was charged with taking indecent liberties with a minor child. However, the trial court found he lacked capacity to be tried and he was committed to Dorothea Dix and Broughton Hospitals. In 1998, defendant pled guilty to the indecent liberties charge and received an eight-year sentence. Having already served most of his time, he was released on parole to Country Time Village, a family care home, in May 1998. While there, his meals were prepared for him, medication dispensed to him and transportation provided to him for his appointments with his parole officer.

Detective Tim Israel ("Det. Israel"), of the Buncombe County Sheriff's Department, testified that on 12 May 1998 defendant came into the sheriff's department to register his change of address, listing Country Time Village as his residence. Det. Israel further testified that, as was the department's procedure, he read the registration form with all of its requirements to defendant, took the appropriate information from defendant to fill out the form, filled out the form, read "Defendant's acknowledgement" [sic] to defendant and then had defendant sign the form. Det. Israel also signed the form. Defendant was given a copy of the registration requirement form. When asked if he knew how defendant got to the sheriff's department, Det. Israel stated that he did not know how defendant got there but that someone was with defendant when he arrived.

On 28 June 1998, defendant was released from Country Time Village and the day following, someone from the sheriff's department came for him and involuntarily committed him to Broughton Hospital. On Sunday, 4 October 1998, defendant was discharged from

Broughton, into Ms. Riddle's care. After picking defendant up, Ms. Riddle testified that she drove defendant to the Buncombe County Sheriff's Department, where defendant and his brother went inside to register defendant's change of address. Ms. Riddle further testified that upon her sons' return to the car she asked, " 'Well, did you get it took [sic] care of?' And he says, 'Yeah.' He said, 'I had to talk to some lady on the telephone and she said everything would be all right.' "

Buncombe County Detective Jerry Dean Owenby, Jr. ("Det. Owenby") testified that, on or about 4 October 1998, the department received a recorded message from Blue Ridge, a mental health facility, informing them that defendant had been released from Broughton Hospital, and that defendant's new address was that of his mother. Det. Owenby further testified that he began calling around on 5 October 1998 "to see if [defendant] was still at Country Time Village. . . . I found out that [defendant] had left Country Time on the 28th of June." Det. Owenby further testified that "prior to . . . the voice mail that I got, I had found out that [defendant] was also—had been in Broughton Hospital for some time. I called down there to see if he was still there, and he wasn't there." Nevertheless, Det. Owenby never called defendant's mother's house to contact defendant or his mother in an effort to get defendant to come in and register. Instead, Det. Owenby waited the required ten days and, on 15 October 1998, Det. Owenby charged defendant with "failing to notify the sheriff's department of a change of address for being a registered sex offender[.]"

At trial Det. Owenby testified, that on 15 or 16 October, "I come into to [sic] work one morning and my secretary asked me if I'd call this guy [defendant] back. He'd called a couple of times and was irate." Det. Owenby further testified that when he returned defendant's call, it was "probably within about four or five days after I charged him." Defendant "answered the phone." "He wanted to know why I had charged him with failing to change his address." "I told him that he had—I'd received a phone call." In response to whether he knew where defendant was at that time, Det. Owenby answered,

[Defendant] was at his mother's residence.

. . .

I called him there. . . .

. . .

He was—he was—actually, he was very nice to me, polite to me. He wanted to know why I had charged him, and at that particular time I found out that he had already had the warrant served. I didn't know prior to that. He told me that he had come to register and somebody told him they would take care of it on that Sunday.

. . .

[Not knowing who, defendant] said the person on the phone, on the green phone, which on the weekends in our—in the main entrance to the sheriff's office, when you walk in there's a green phone you pick up. You get a dispatcher and they will—they will help you from there.

Det. Owenby further stated that sex offender registration is not available on Sundays, but only during normal business hours. Det. Owenby testified that he later inquired of the people in his office as to whether they had advised defendant that they would take care of it, but was unable to discover anyone who had.

Defendant was brought to trial on the subject charge, and his attorney filed a motion to have defendant examined to determine whether he had the capacity to proceed, which motion was granted. In his evaluation report of defendant dated 15 December 1998, certified forensic screening evaluator Marc Strange ("Mr. Strange"), stated:

[Defendant] has an extensive history of inpatient and outpatient psychiatric treatment. He appears to have been psychiatrically hospitalized at least 35 times to date. This included multiple commitments to Broughton State Hospital and Dorothea Dix Hospital. His most recent commitment was at Broughton for approximately 10 days on December 2, 1998. Historically, [defendant's] commitments have been the result of an active psychotic thought disorder, poor medication compliance, inappropriate and illegal sexual behavior (primarily exposing his genitals in public accompanied by loud and sometimes aggressive behavior), and/or assaultive behavior. He has been adjudicated to be legally incompetent, with his mother being made his guardian, and is a Registered Sex Offender in Buncombe County. In the past, [defendant] has routinely refused to comply with psychotropic medications due to his stated belief that they are either poisons or that he does not require them. His compliance has been notably improved by the use of neuroleptic injections.

STATE v. YOUNG

[140 N.C. App. 1 (2000)]

During his last commitment to Broughton, he was removed from injections and once again placed on oral medication. [Defendant's] current psychiatric diagnoses are Schizophrenia, chronic, undifferentiated; Antisocial Personality Disorder; and, Alcohol Abuse. . . .

. . .

[Defendant's] comprehensions of his current legal situation, and of the courtroom process involving him, appear to be intact. He is able to clearly describe the current charge against him (failure to register as a sex offender), how that charge came about (he moved and failed to notify authorities within the legal time limit), and the range of possible consequences he would face should he be convicted of that charge. . . .

[Defendant] does demonstrate limited insight with regard to the extent and significance of his sexual offenses and consistently minimizes these events. This would seem consistent with his level of cognitive impairment and his Axis I and II characteristics. Although occasional loose associations of a nondisruptive nature mark his comments, [defendant] is clearly able to effectively meet the state's criteria to demonstrate competency to proceed. . . .

Thus, the trial court allowed the trial to proceed. Defendant was tried by a jury and found guilty. Finding aggravating factors, the trial court sentenced defendant to fifteen to eighteen months in prison.

At trial, defendant preserved six assignments of error, but he argues only four to this Court, thus we deem the others abandoned. N.C.R. App. P. 28(b). In his first three assignments of error, defendant argues that the statute under which he was convicted (N.C. Gen. Stat. § 14-208.11) is unconstitutional under both the United States Constitution and the North Carolina Constitution because: (1) it violates due process requirements by making a sex offender's failure to notify of change of address a strict liability felony offense; (2) as applied to defendant, it severely punishes an incompetent person for failing to take some affirmative action, without regard to fault or legal excuse; and (3) it violates the Constitutions' prohibition on *ex post facto* laws by increasing the punishment for sex offenders after the commission of their crimes. Defendant further assigns error to the trial court's failure to dismiss the bill of indictment when the indictment included the term "knowingly" committed, an element of the

crime which was not required of the State to prove. Due to our disposition of the case, we address only defendant's argument that the statute is unconstitutional as applied to him.

This is a case of first impression for North Carolina and, based on our extensive research, it may well be a case of first impression for the nation. That is, whether a state statute requiring a convicted sex offender to register with the county sheriff's department his wholly innocent act of changing addresses, applies to an individual who has been adjudicated incompetent.

Our Supreme Court has held that:

> The authority of this Court to declare an act of the Legislature unconstitutional arises from its duty to determine, in accordance with applicable and valid rules of law, the rights of litigants in a controversy brought before it by proper procedure. Consequently, when asked to determine the constitutionality of a statute, the Court will do so *only* to the extent necessary to determine that controversy. It will not undertake to pass upon the validity of the statute as it may be applied to factual situations materially different from that before it. . . .

*Watch Co. v. Brand Distributors and Watch Co. v. Motor Market,* 285 N.C. 467, 472, 206 S.E.2d 141, 145 (1974) (citation omitted) (emphasis added). Therefore, we hold that as applied to the facts of this case involving this defendant, an adjudicated incompetent, N.C. Gen. Stat. § 14-208.11 is unconstitutional because it fails to provide him with *sufficient notice or knowledge to overcome United States Constitutional Fifth and Fourteenth Amendment due process* requirements.

This Court in *In re Lamm,* 116 N.C. App. 382, 448 S.E.2d 125 (1994) opined that,

> "The Fifth and Fourteenth Amendments to the United States Constitution, together with the Law of the Land Clause of Article I, § 19 of the North Carolina Constitution, provide that no person shall be deprived of life, liberty or property without due process of law." *State v. McCleary,* 65 N.C. App. 174, 180, 308 S.E.2d 883, 888 (1983), *affirmed,* 311 N.C. 397, 316 S.E.2d 870 (1984). Article I, § 19 of the North Carolina Constitution is synonymous with "due process of law" as that term is applied under the Fourteenth Amendment to the federal Constitution. *In re Moore,* 289 N.C. 95, 221 S.E.2d 307 (1976); *McNeill v. Harnett County,* 327 N.C. 552,

STATE v. YOUNG

[140 N.C. App. 1 (2000)]

398 S.E.2d 475 (1990), and United States Supreme Court interpretations of the latter, though not binding, are highly persuasive in construing the former. *Watch Co. v. Brand Distributors*, 285 N.C. 467, 206 S.E.2d 141 (1974). However, in deciding what procedural safeguards are due under Article I, § 19 of the North Carolina Constitution, the North Carolina Supreme Court has employed a somewhat different method of decision than that employed by the United States Supreme Court for deciding similar questions under the due process clause of the federal constitution. *Henry v. Edmisten*, 315 N.C. 474, 340 S.E.2d 720 (1986). *Accordingly we must examine the procedures prescribed by the State [statute] at issue, and **particularly as applied to respondent in this case**, to determine whether they comport with the requirements of due process* under both constitutions.

. . .

Due process of law formulates a flexible concept, to insure fundamental fairness in judicial or administrative proceedings which may adversely affect the protected rights of an individual. Due process means simply a procedure which is fair and does not mandate a single, required set of procedures for all occasions; *it is necessary to consider the specific factual context . . . involved. In resolving any claimed violation of procedural due process, a balance must be struck between the respective interests of* the individual and the governmental entity seeking a remedy. . . . *At a minimum, due process requires adequate notice of the charges and a fair opportunity to meet them, and **the particulars of notice and hearing must be tailored to the capacities and circumstances of those who are to be heard.***

*Id.* at 384-86, 448 S.E.2d at 128-29 (emphasis added) (citations omitted).

In the present case, the North Carolina statute at issue states in pertinent part:

(a) A person required . . . to register who does any of the following is guilty of a Class F felony:

(1) Fails to register.

(2) Fails to notify the last registering sheriff of a change of address.

(3) Fails to return a verification notice as required under G.S. 14-208.9A.

. . .

(a1) If a person commits a violation of subsection (a) of this section, the probation officer, parole officer, or any other law enforcement officer who is aware of the violation shall immediately arrest the person in accordance with G.S. 15A-401, or seek an order for the person's arrest in accordance with G.S. 15A-305.

(b) Before a person convicted of a violation of this Article is due to be released from a penal institution, an official of the penal institution shall conduct the prerelease notification procedures specified under G.S. 14-208.8(a)(2) and (3). If upon a conviction for a violation of this Article, no active term of imprisonment is imposed, the court pronouncing sentence shall, at the time of sentencing, conduct the notification procedures specified under G.S. 14-208.8(a)(2) and (3).

N.C. Gen. Stat. § 14-208.11 (1999).

We begin by noting that the statute, as it is written, states that an individual *who DOES a thing*, is in violation of the statute. However in actuality, violation of the statute is in the *passive act* of *the individual's NOT doing the thing*—specifically at issue here, defendant's not registering his change of address. Furthermore, we note that the statute has no requirement of knowledge or intent, so as to require that the State prove either defendant knew he was in violation of or intended to violate the statute when he failed to register his change of address. However, in line with due process notice requirements, our Legislature has written the statute such that it mandates a convicted sex offender be notified of the registration requirements. N.C. Gen. Stat. § 14-208.11(b). Under ordinary circumstances such a provision would work to remove the statute from due process notice attacks. Thus the State argues that in having registered once before and having signed and received notification of the on-going requirement to register any changes of address, "defendant was affirmatively put on notice yet again by Detective Timothy Israel . . . ." We disagree.

Our General Assembly has clearly set out the legal meaning of an incompetent as one

> who lacks sufficient capacity to manage [his/her] own affairs or *to make or communicate important decisions concerning*

STATE v. YOUNG

[140 N.C. App. 1 (2000)]

*[his/her] person, family, or property whether the lack of ca-
pacity is due to mental illness, mental retardation, epilepsy,
cerebral palsy, autism, inebriety, senility, disease, injury, or
similar cause or condition.*

N.C. Gen. Stat. § 35A-1101(7) (1999) (emphasis added). Furthermore,
in an effort to protect these individuals, our laws authorize the judi-
ciary to appoint guardians to assist these individuals in conducting
their daily affairs. "The essential purpose of guardianship for an
incompetent person is to replace the individual's authority to make
decisions with the authority of a guardian when the individual does
not have adequate capacity to make such decisions." N.C. Gen. Stat.
§ 35A-1201(a)(3) (1999). Thus, we know that in order for defendant to
have been adjudicated incompetent by a court of this state and his
mother appointed his guardian, the court must have found that
defendant either (1) lacked sufficient capacity to manage his own
affairs; or (2) lacked sufficient capacity to make or communicate
important decisions concerning his person. *Id.* The record does not
indicate the court's findings with regard to the adjudication; however,
that is of no importance since the State does not (and could not at
this time) argue that the adjudication was improper.

It is true—the record before us revealing—that based on Det.
Israel's explaining to defendant the sex offender's registration
requirements, defendant was provided with "actual knowledge"
enough to satisfy due process requirements for any reasonable and
prudent man. However, "defendant has been legally determined to be
incapable of managing his own affairs." In light of defendant's incom-
petency, he is not a reasonable and prudent man. His mother testified
that defendant was of average mental capacity until the age of seven-
teen when he suffered injuries sustained in a moped accident and,
since that time, he has been unable to manage his own personal
affairs. Consequently, defendant was adjudicated incompetent in
1989, pursuant to N.C. Gen. Stat. § 35A, and has lived the last eleven
years of his life in and out of state mental hospitals, having been hos-
pitalized "at least 35 times" over the course of his lifetime. Therefore,
because defendant was adjudicated incompetent, we believe that
what constituted "actual notice" to a reasonable and prudent man,
was not sufficient notice to this defendant.

Pursuant to North Carolina statutory and case law which govern
the affairs of adjudicated incompetents, our courts have long held
that it is impermissible (if not impossible) to solely give notice to the

actual incompetent person himself, expecting then to enforce rights against him:

> If any person, to whom notice must be given . . . is a minor or is incompetent, then the notice shall be given to his duly appointed guardian or other duly appointed representative . . . .

N.C. Gen. Stat. § 35A-1353 (1999). Furthermore:

> Once an adjudication of incompetency is made, [and] a guardian is appointed, [] the incompetent becomes a ward of the guardian. The authority of the guardian then replaces the authority of the ward to manage the ward's affairs. Therefore, upon an adjudication of incompetence, the ward loses h[is] legal rights, including the right to make contracts, to control and sell property and to vote. . . . [T]he legal ability to form contracts [even] encompasses basic rights including the ability to purchase groceries or retail items . . . .

Laura M. Wolfe, Comment, *A Clarification of the Standard of Mental Capacity in North Carolina for Legal Transactions of the Elderly*, 32 Wake Forest L. Rev. 563, 564 (1997) (footnotes omitted citing N.C. Gen. Stat. §§ 35A-1120, 35A-1201(a)(3), 35A-1241 and 35A-1251). Thus, we find that N.C. Gen. Stat. § 14-208.11 does not provide adequate notice for an incompetent sex offender to comply with the statute's requirements. Due process requires not just the mechanical act of notifying a defendant or the automatic assumption that the notice is good, but in fact, we believe due process requires that notice be synonymous with the ability to comply.

We find *Lambert v. California*, 355 U.S. 225, 2 L. Ed. 2d 228 (1957), dispositive. In *Lambert*, the plaintiff was a convicted felon who as such, under the California Municipal Code, was required to register with the city if she remained (or intended to remain) in Los Angeles for more than five days. After living in Los Angeles for more than seven years, plaintiff was arrested on suspicion of another offense and then charged with violation of the registration law. On appeal to the United States Supreme Court on the grounds that the Code was unconstitutional, the Court opined:

> The question is whether a registration act of this character violates due process *where it is applied to a person who has no actual knowledge of his duty to register,* and where no showing is made of the probability of such knowledge.

STATE v. YOUNG

[140 N.C. App. 1 (2000)]

[We recognize that] conduct alone without regard to the intent of the doer is often sufficient. There is wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence [intent] from its definition. *But we deal here with conduct that is wholly passive—mere failure to register. It is unlike the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed.* [Nevertheless,] [t]he rule that "ignorance of the law will not excuse" (*Shevlin-Carpenter Co. v. Minnesota, supra,* (218 U.S. 68)) is deep in our law, as is the principle that of all the powers of the local government, the police power is "one of the least limitable." *District of Columbia v. Brooke,* 214 U.S. 138, 149, 53 L. Ed. 941, 945, 29 S.Ct. 560. On the other hand, due process places some limits on its exercise. Engrained [sic] in our concept of due process is the requirement of notice. Notice is sometimes essential so that the citizen has the chance to defend charges. Notice is required before property interests are disturbed, before assessments are made, before penalties are assessed. Notice is required in a myriad of situations where a penalty or forfeiture might be suffered for mere failure to act. . . . [T]he principle is equally appropriate where a person, wholly passive and unaware of any wrongdoing, is brought to the bar of justice for condemnation in a criminal case.

Registration laws are common and their range is wide. . . . But the present ordinance is entirely different. Violation of its provisions is unaccompanied by any activity whatever, mere presence in the city being the test. Moreover, circumstances which might move one to inquire as to the necessity of registration are completely lacking. . . . *We believe that actual knowledge of the duty to register or proof of the probability of such knowledge and subsequent failure to comply are necessary before a conviction under the ordinance can stand.* As Holmes wrote in The Common Law, "A law which punished conduct which would not be blameworthy in the average member of the community would be too severe for that community to bear." *Id.* at 50. *Its severity lies in the absence of an opportunity either to avoid the consequences of the law or to defend any prosecution brought under it. Where a person did not know of the duty to register and where there was no proof of the probability of such knowledge, he may not be convicted consistently with due process.* Were it otherwise, the evil would be as great as it is when the law is written in print too fine to read or in a language foreign to the community.

*Id.* at 227-30, 2 L. Ed. 2d at 231-32 (emphasis added) (citations omitted). Thus, although ignorance of the law is no excuse, and the statute at issue does *not* require the State to prove intent, due process requires that defendant have knowledge, actual or constructive, of the statutory requirements before he can be charged with its violation. *Id.*

We recognize that *Lambert* has been very narrowly construed and that few cases since have been able to successfully argue its application to new facts before the Court. However, we note that each time a court has refused to apply *Lambert*, the defendant at hand either knew or should have known of the possible violation. For example, where the defendant in *U.S. v. Lamb*, 945 F.Supp. 441 (N.D.N.Y. 1996), was charged with the distribution of child pornography, the court opined

> the possession and distribution of child pornography is an activity which the average person would think unlawful. Moreover, the conduct defendant is charged with is not wholly passive, but rather involves transmission over the computer and possible solicitation of downloads from like-minded individuals. . . .

*Id.* at 454. Similarly, in *U.S. v. Meade*, 175 F.3d 215 (1st Cir. 1999), defendant Meade argued that although he had been charged with stalking his wife, his possession of a handgun was wholly innocent. Disagreeing, the court opined:

> Meade nevertheless tries to bring his case within the *Lambert* exception by arguing that firearms possession is an act sufficiently innocent that no one could be expected to know that he would violate the law merely by possessing a gun. As *Staples v. United States*, 511 U.S. 600, 610-12, 114 S.Ct. 1793, 128 L. Ed. 2d 608 (1994), makes clear, firearms possession, without more, is not a kind of activity comparable to possession of hand grenades, *see Freed*, 401 U.S. at 609, 91 S.Ct. 1112, narcotics, *see United States v. Balint*, 258 U.S. 250, 253-54, 42 S.Ct. 301, 66 L. Ed. 604 (1922), or child pornography, *see United States v. Robinson*, 137 F.3d 652, 654 (1st Cir. 1998). But possession of firearms by persons laboring under the yoke of anti-harassment or anti-stalking restraining orders is a horse of a different hue. The dangerous propensities of persons with a history of domestic abuse are no secret, and the possibility of tragic encounters has been too often realized. We think it follows that a person who is subject to such an order would not be sanguine about the legal consequences of

possessing a firearm, let alone of being apprehended with a handgun in the immediate vicinity of his spouse. . . .

*Id.* at 226. Likewise, the 4th Circuit District Court rejected defendant Bostic's argument that *Lambert* applied, stating:

By engaging in abusive conduct toward [his wife and child, the defendant] removed himself from the class of ordinary citizens. . . . Like a felon, a person in [defendant's] position cannot reasonably expect to be free from regulation when possessing a firearm.

*U.S. v. Bostic*, 168 F.3d 718, 722 (4th Cir. 1999).

Nonetheless, it is the State's contention before this Court that defendant was competent enough to register his change of address himself. In support of its argument, the State cites the fact that "[a]fter leaving the Sheriff's Office on Sunday, October 4, 1998, the defendant's mother gave him money to catch a bus to come back to the Sheriff's Office to change his address," an indication that defendant was capable of registering himself. The State further argues that although defendant was adjudicated incompetent years ago, the trial court found defendant competent to stand trial for the charge of violating the statute's change of address requirement and properly "instructed the jury that [defendant's being adjudicated] incompeten[t] . . . does not absolve the defendant from criminal liability." We find the State's rationale unpersuasive.

To start, the State's own witness, Det. Israel admitted that when defendant showed up at the sheriff's office to register the first time (May 1998), defendant had not driven himself, nor had he come alone. Additionally, when defendant attempted to register on Sunday, 4 October 1998 his mother drove him and his brother accompanied him inside the sheriff's office. Furthermore, when defendant's mother gave him money to catch a bus to register, defendant never arrived. We do not find these facts persuasive to show that defendant was capable of registering himself. On the contrary, we deduce from these incidents that defendant was only able to comply with registering when he was accompanied by another adult. Furthermore, we note that in finding defendant competent to stand trial, the trial court was only finding that defendant—**at the time of trial**—was competent to assist in his defense. 21 Am. Jur. 2d *Criminal Law* § 96 (1981). This is *NOT* the same as a finding of whether defendant knew, understood and was able to comply with the requirement that he register his

change of address during the ten days in which he had to register to avoid arrest. Thus, it is irrelevant as to whether defendant had proper notice.

Next, we address the State's contention that because the trial court found defendant competent to stand trial, whatever the jury's verdict, defendant received due process. We again, disagree. It is true that under most circumstances, a criminal defendant is not absolved from criminal liability just because he has been adjudicated incompetent. However, a test for determining defendant's competency to stand trial (which the trial court conducted) is substantially different from one which would determine whether defendant was competent to comply with the requirements of registration at the time he must necessarily have registered to avoid violating the subject statute. 21 Am. Jur. 2d *Criminal Law* § 96 (1981). The latter was NOT a test conducted by the trial court. (We note that up until now, this type of test would fall in line with an insanity defense for criminal acts *committed*.) However, taking our lead from *Lambert, supra,* we believe that due to the nature of the subject statute's requirement and the wholly innocent act (an *omission*) through which the statute may so easily be violated, proof of an adjudicated incompetent defendant's ability to comply must necessarily be an element of the State's *prima facie* case to satisfy due process requirements. Thus, N.C. Gen. Stat. § 14-208.11 is unconstitutional as applied to him.

Defendant at bar received a sentence of fifteen to eighteen months in prison for failing to register his change of address from a mental institution to his mother's home (with whom he had lived all of his life). From the time the defendant moved back home, the sheriff's office not only knew where to find the defendant, its officers served the warrant on defendant at his mother's home and later telephoned defendant at his mother's home before they arrested him there. Granted, our statutes do not require the sheriff to contact a sex offender and advise them to come in and register before the ten-day period has run. However, in the case of this incompetent defendant, the sheriff could easily have avoided the extreme time and cost of litigation to the State had he seen fit to advise this defendant's mother that defendant had yet to register. (We note that even in cases involving an incompetent's property, our case law has long required notice be given to the guardian of the incompetent.) However, we do not suggest that had the State contacted defendant's mother, notice to defendant would then have been perfected. On the contrary, as written, our current sex offender registration laws do not adequately

address the situation at hand, neither do they efficiently provide a way for the State to enforce the registration requirements against an adjudicated incompetent. Our General Assembly must revisit this issue to adequately provide the State a way to enforce these registration laws while protecting the rights of adjudicated incompetents in North Carolina.

Nevertheless, we hold that as applied to an adjudicated incompetent defendant, N.C. Gen. Stat. § 14-208.11 is unconstitutional because it fails to afford him sufficient notice as required by due process under the Fifth and Fourteenth Amendments to the United States Constitution. Finding it so, we need not address the statute's unconstitutionality under North Carolina's Constitution. Therefore, the trial court's judgment is hereby

Reversed.

Judge GREENE concurs.

Judge HORTON concurs in the result.