STEPHENS, Judge.
 

 *330
 
 The sole issue presented by this appeal is one of first impression: whether Defendant Austin Lynn Miller's conviction under subsection 90-95(d1) (1)(c) of our North Carolina General Statutes, which makes possession of a product containing pseudoephedrine by any person
 
 *331
 
 previously convicted of possessing methamphetamine a class H felony, violated his due process rights. For the reasons which follow, we hold that Miller's due process rights under the United States Constitution were violated by his conviction of a strict liability offense criminalizing otherwise innocuous and lawful behavior without providing him notice that a previously lawful act had been transformed into a felony for the subset of convicted felons to which he belonged.
 

 Factual and Procedural History
 

 Like the legislative branches of many other states across the nation, our General Assembly has passed various laws over the past three decades seeking to combat the scourge of methamphetamine abuse. Each of the provisions discussed herein falls under Article 5, Chapter 90 of our General Statutes: the North Carolina Controlled Substances Act ("the CSA"). Pertinent to this case, effective 1 January 2012, section 90-113.52A of the CSA ("the record-keeping statute") mandated electronic record keeping by retail stores that sell products containing pseudoephedrine, an essential ingredient in the manufacture of methamphetamine. Subsection (a) of the record-keeping statute provides that "[a] retailer shall, before completing a sale of a product containing a pseudoephedrine product, electronically submit the required information to the National Precursor Log Exchange (NPLEx) administered by the National Association of Drug Diversion Investigators (NADDI)[.]" N.C. Gen.Stat. § 90-113.52A(a) (2013). In turn, subsection (c) of the record-keeping statute specifies that "NADDI shall forward North Carolina transaction records in NPLEx to the State Bureau of Investigation weekly and provide
 
 *514
 
 real-time access to NPLEx information through the NPLEx online portal to law enforcement in the State...." N.C. Gen.Stat. § 90-113.52A(c). Finally, the General Assembly mandated that the record-keeping "system shall be capable of generating a stop sale alert, which shall be a notification that completion of the sale would result in the seller or purchaser violating the quantity limits set forth in [section] 90-113.52."
 
 [1]
 
 N.C. Gen.Stat. § 90-113.52A(d).
 
 *332
 
 Prior to 1 December 2013, section 90-95, which proscribes violations and penalties under the CSA, made it "unlawful for any person to ... [p]ossess an immediate precursor chemical
 
 with intent to manufacture a controlled substance
 
 ... [or to p]ossess or distribute an immediate precursor chemical
 
 knowing, or having reasonable cause to believe, that the immediate precursor chemical will be used to manufacture a controlled substance.
 
 " N.C. Gen.Stat. § 90-95(d1)(1)(a) - (b) (2011) (emphasis added). Thus, before 1 December 2013, the purchase and possession of pseudoephedrine products was legal for all citizens, even those with prior methamphetamine convictions, unless the products were possessed with the knowledge or intent that they be used to manufacture methamphetamine. Effective 1 December 2013, section 90-95(d1)(1) was amended to add subsection (c) ("the new subsection"), making it "unlawful for any person to ... [p]ossess a pseudoephedrine product if the person has a prior conviction for the possession or manufacture of methamphetamine." N.C. Gen.Stat. § 90-95(d1)(1)(c) (2013). Violation of this provision is a Class H felony.
 
 Id.
 

 On Monday, 7 January 2014, Detective John Hollar of the Watauga County Sheriff's Office ("WCSO") reviewed the weekend's NPLEx logs and saw that Miller, a former methamphetamine offender,
 
 [2]
 
 had purchased one 3.6 gram box of allergy and congestion relief medicine, a pseudoephedrine product, from the Boone Walmart. As noted
 
 supra,
 
 Miller's purchase and possession of this product in this amount had been entirely lawful up until the new subsection went into effect the previous month. Hollar went to the Walmart to investigate Miller's purchase where he learned that the store's video surveillance system had not been working over the weekend. However, Hollar did obtain a copy of a Walmart receipt that appeared to contain Miller's electronic signature and indicated that Miller purchased a pseudoephedrine product on Saturday afternoon.
 

 On 23 January 2014, Hollar obtained an arrest warrant for Miller which he served on Miller at his probation officer's office the following day. On 4 August 2014, Miller was indicted under the new subsection for possessing a pseudoephedrine product having been previously convicted of methamphetamine possession. On 4 February 2015, Miller filed
 
 *333
 
 a motion to declare the new subsection unconstitutional as applied to him, citing
 
 Lambert v. California,
 

 355 U.S. 225
 
 ,
 
 78 S.Ct. 240
 
 ,
 
 2 L.Ed.2d 228
 
 (1957).
 

 The matter came on for trial at the 2 February 2015 criminal session of Watauga County Superior Court, the Honorable Eric C. Morgan, Judge presiding. During a pretrial motion hearing, Miller argued that the new subsection is unconstitutional because it lacks any element of scienter or intent and the State failed to provide him any notice of the statute and its implications. In response, the State contended that no intent element was necessary because of the extreme danger to the public posed by methamphetamine
 
 *515
 
 labs. The State compared the new subsection to laws prohibiting the possession of a firearm by a convicted felon, which the State contended have been upheld as constitutional despite the lack of any intent element or notice provision. After hearing arguments of counsel, the trial court denied Miller's motion to declare the new subsection unconstitutional, stating:
 

 All right, in this matter, coming on to be heard, and being heard, on the defendant's motion to declare [ section] 90-95(d1)(1)(c) unconstitutional. The [c]ourt having considered the arguments of counsel, having reviewed the authorities cited by counsel together with the pleadings filed in this action, and the [c]ourt having considered the [S]tate's argument of statute, [ section] 90-95(d1)(1)(c) is analogous to North Carolina['s] possession of firearm by felon statute found in [section] 14-415.1. And the [c]ourt noting that the possession of firearm by felon statute has been upheld by North Carolina courts as constitutional in the cases of [ ]
 
 State [v.] Tanner,
 

 39 N.C.App. 668
 
 [
 
 251 S.E.2d 705
 
 (1979) ];
 
 State [v.] Cooper,
 

 364 N.C. 404
 
 [
 
 700 S.E.2d 215
 
 ] ; and
 
 State [v.] Coltrane,
 

 188 N.C.App. 498
 
 [
 
 656 S.E.2d 322
 
 ], among other cases.
 

 Further, the Court having reviewed [section] 90-95(d1)(1)(c), in the exercise of its discretion, denies [sic] to declare N.C. Gen.Stat. [§ ] 90-95(d1)(1)(c) unconstitutional.
 

 At trial, the State offered testimony,
 
 inter alia,
 
 from Hollar about his investigation, as described
 
 supra,
 
 and from the Walmart pharmacy manager about the system for tracking the sale of pseudoephedrine products. At the close of the State's evidence, Miller moved to dismiss,
 

 based on the testimony of the witnesses that have been presented by the [S]tate. Chiefly, the pharmacy manager and the lack of knowledge that she presented regarding how this data is entered, how it could, or could not
 
 *334
 
 be, manipulated by a pharmacy worker, and just, I don't believe that the [S]tate has presented enough evidence that a jury could reasonably find Mr. Miller guilty of this, of the crime as charged. I will also note that there is a defect in the indictment. I will argue that it is a fatal defect.
 

 The trial court denied the motion to dismiss, and Miller offered no evidence. During the charge conference, Miller requested a jury instruction on specific intent, and the court agreed to give North Carolina Pattern Jury Instruction 120.10, informing the jury that intent "must ordinarily be proved by circumstances from which it may be inferred." However, the court did not instruct the jury that the offense with which Miller was charged required the State to prove any
 
 element
 
 of intent. The jury returned a verdict of guilty, and the trial court imposed a sentence of 6 to 17 months, suspended the sentence, and placed Miller on supervised probation for 24 months.
 

 Miller's Petition for Writ of Certiorari
 

 During his sentencing hearing, Miller indicated that he intended to appeal his conviction. The parties then discussed an appeal bond, and the court entered judgment on Miller's conviction. Following the imposition of judgment, the trial court asked Miller if he wanted an appointed attorney for his appeal and he responded in the affirmative. As Miller concedes in his petition for writ of
 
 certiorari,
 
 however, he failed to enter proper notice of appeal following entry of judgment. Rule 4 of the Rules of Appellate Procedure provides that notice of appeal in criminal actions can be taken by "(1) giving oral notice of appeal at trial, or (2) filing notice of appeal with the clerk of superior court and serving copies thereof upon all adverse parties within fourteen days after entry of the judgment...." N.C.R.App. P. 4(a). Oral notice of appeal must be given
 
 after
 
 the entry of judgment.
 
 See
 
 N.C. Gen.Stat. § 15A-1444(a) (2015) ("A defendant who has entered a plea of not guilty to a criminal charge, and who has been found guilty of a crime, is entitled to appeal as a matter of right
 
 when final judgment has been entered.
 
 " (emphasis added)).
 

 Recognizing his failure to give timely notice of appeal, on 5 June 2015, Miller filed in this Court a petition for writ of
 
 certiorari
 
 asking that we exercise our discretion to address the merits of his argument.
 
 See,
 

 *516
 

 e.g.,
 

 State v. McCoy,
 

 171 N.C.App. 636
 
 , 638,
 
 615 S.E.2d 319
 
 , 320 ("While this Court cannot hear [a] defendant's direct appeal [for failure to properly give notice of appeal], it does have the discretion to consider the matter by granting a petition for writ of
 
 certiorari.
 
 "),
 
 appeal dismissed,
 

 360 N.C. 73
 
 ,
 
 622 S.E.2d 626
 
 (2005). On 17 June 2015, the State filed its
 
 *335
 
 response to Miller's petition, acknowledging our discretion to grant the petition. By order entered 24 June 2015, Miller's petition for writ of
 
 certiorari
 
 was referred to this panel. We allow Miller's petition and address the merits of his appellate argument.
 

 Discussion
 

 Miller argues that the new subsection is unconstitutional as applied to him in that it violates the due process clauses of the United States and North Carolina Constitutions. Specifically, Miller contends that the new subsection violates his substantive due process rights by subjecting him to punishment for a serious offense without requiring any evidence of intent and violates his procedural due process rights by punishing him for an act that was legal a month earlier without any notice to him that such conduct was now criminal. We hold that Miller's conviction of the strict liability offense created by the new subsection in the absence of notice violated his rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.
 

 I. Standard of review
 

 "The standard of review for alleged violations of constitutional rights is
 
 de novo.
 
 "
 
 State v. Graham,
 

 200 N.C.App. 204
 
 , 214,
 
 683 S.E.2d 437
 
 , 444 (2009) (citation omitted),
 
 appeal dismissed and disc. review denied,
 

 363 N.C. 857
 
 ,
 
 694 S.E.2d 766
 
 (2010).
 

 II. Strict liability nature of the offense defined in the new subsection
 

 As part of his argument in the trial court and on appeal, Miller first urges that an intent element should be read into the new subsection despite the absence of explicit language regarding
 
 mens rea.
 
 Because we conclude that this omission was an intentional decision by our General Assembly, we must decline to graft an intent element onto this new offense.
 

 "It is within the power of the Legislature to declare an act criminal irrespective of the intent of the doer of the act. The doing of the act expressly inhibited by the statute constitutes the crime."
 
 State v. Hales,
 

 256 N.C. 27
 
 , 30,
 
 122 S.E.2d 768
 
 , 771 (1961) (citations omitted).
 

 Whether a criminal intent is a necessary element of a statutory offense is a matter of construction to be determined from the language of the statute in view of its manifest purpose and design. As a cardinal principle of statutory interpretation, if the language of the statute is clear and is not ambiguous, we must conclude that the legislature
 
 *336
 
 intended the statute to be implemented according to the plain meaning of its terms. Thus, in effectuating legislative intent, it is the duty of the courts to give effect to the words actually used in a statute and not to delete words used or to insert words not used.
 

 State v. Watterson,
 

 198 N.C.App. 500
 
 , 505,
 
 679 S.E.2d 897
 
 , 900 (2009) (citations, internal quotation marks, and brackets omitted). The
 
 Watterson
 
 Court went on to note that, where "the General Assembly specifically included additional intent provisions in [certain] subsections of the statute, we can presume that it did not intend for courts to impose additional intent requirements in the other subsections."
 
 Id.
 
 at 505-06,
 
 679 S.E.2d at
 
 900 (citing
 
 N.C. Dep't of Revenue v. Hudson,
 

 196 N.C.App. 765
 
 , 768,
 
 675 S.E.2d 709
 
 , 711 (2009) ("When a legislative body includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislative body] acts intentionally and purposely in the disparate inclusion or exclusion.") (citation and internal quotation marks omitted)).
 

 As noted
 
 supra,
 
 the new subsection makes it a felony to "[p]ossess a pseudoephedrine product if the person has a prior conviction for the possession or manufacture of methamphetamine." N.C. Gen.Stat. § 90-95(d1)(1)(c). The plain language of the new subsection does not specify any intent element,
 
 [3]
 

 *517
 
 and we cannot "insert words not used."
 
 Watterson,
 

 198 N.C.App. at 505
 
 ,
 
 679 S.E.2d at 900
 
 (citations omitted). Further, a careful reading of the new subsection in context reveals that our General Assembly specifically included intent elements in each of the other, previously enacted subsections of 90-95(d1):
 

 *337
 
 (1) Except as authorized by this Article, it is unlawful for any person to:
 

 a. Possess an immediate precursor chemical
 
 with intent
 
 to manufacture a controlled substance; or
 

 b. Possess or distribute an immediate precursor chemical
 
 knowing, or having reasonable cause to believe,
 
 that the immediate precursor chemical will be used to manufacture a controlled substance; or
 

 c. Possess a pseudoephedrine product if the person has a prior conviction for the possession or manufacture of methamphetamine.
 

 Any person who violates this subdivision shall be punished as a Class H felon, unless the immediate precursor is one that can be used to manufacture methamphetamine.
 

 (2) Except as authorized by this Article, it is unlawful for any person to:
 

 a. Possess an immediate precursor chemical
 
 with intent
 
 to manufacture methamphetamine; or
 

 b. Possess or distribute an immediate precursor chemical
 
 knowing, or having reasonable cause to believe,
 
 that the immediate precursor chemical will be used to manufacture methamphetamine.
 

 Any person who violates this subdivision shall be punished as a Class F felon.
 

 N.C. Gen.Stat. § 90-95(d1) (emphasis added).
 
 [4]
 
 We must presume that our General Assembly acted "intentionally and purposely in the disparate inclusion or exclusion" of an intent element in each subsection,
 
 see
 

 Watterson,
 

 198 N.C.App. at 506
 
 ,
 
 679 S.E.2d at 900
 
 , and accordingly, we conclude that our legislature intended for the new subsection to be
 
 *338
 
 exactly what its plain language indicates: a strict liability offense without any element of intent.
 
 [5]
 

 III. Consideration of the constitutionality of the new subsection
 

 We now turn to Miller's contention that the new subsection is unconstitutional as applied to him insofar as it is a strict liability offense that criminalizes otherwise innocuous and lawful behavior by him without providing him notice that those acts are now crimes. In our consideration of this contention, we
 
 *518
 
 emphasize the distinction between
 
 intent to commit a crime,
 
 which, as discussed
 
 supra,
 
 the new subsection does not require, and notice,
 
 i.e.,
 
 the knowledge that one is subject to criminal penalties for a particular act. As discussed herein, we conclude that the absence of any notice to Miller that he was subject to serious criminal penalties for an act legal for most people, most convicted felons, and indeed, for Miller himself only a few weeks previously, renders the new subsection unconstitutional as applied to him.
 

 A. Overview of the role of mens rea and notice to protect due process rights
 

 Under the United States Constitution, it is a "basic principle that a criminal statute must give fair warning of the conduct that it makes a crime...."
 
 Bouie v. City of Columbia,
 

 378 U.S. 347
 
 , 350,
 
 84 S.Ct. 1697
 
 , 1701,
 
 12 L.Ed.2d 894
 
 , 898 (1964) (discussing the due process rights guaranteed by U.S. Const. amend. XIV ). In criminal statutes, due process rights are most often protected by the inclusion of a
 
 mens rea
 
 element:
 

 The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.
 

 Liparota v. United States,
 

 471 U.S. 419
 
 , 425,
 
 105 S.Ct. 2084
 
 , 2088,
 
 85 L.Ed.2d 434
 
 , 440 (1985) (citation and internal quotation marks omitted).
 

 While mindful of the "core due process concepts of notice, foreseeability, and, in particular, the right to fair warning as those concepts bear on the constitutionality of attaching criminal penalties to what previously had been innocent conduct[,]"
 

 *339
 

 Rogers v. Tennessee,
 

 532 U.S. 451
 
 , 459,
 
 121 S.Ct. 1693
 
 , 1698-99,
 
 149 L.Ed.2d 697
 
 , 706 (2001) (citation omitted), courts have held constitutional certain strict liability crimes or " public welfare offense[s] which ... depend on no mental element but consist only of forbidden acts or omissions."
 
 Liparota,
 

 471 U.S. at 433
 
 ,
 
 105 S.Ct. at 2092
 
 ,
 
 85 L.Ed.2d at 444
 
 (citation and internal quotation marks omitted). For such offenses, which arise from conduct "a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety [,]" notice that an act may subject one to criminal penalties will be presumed even in the absence of any explicit
 
 mens rea
 
 element.
 

 Id.
 

 at 433
 
 ,
 
 105 S.Ct. at 2092
 
 ,
 
 85 L.Ed.2d at 444
 
 . For example, the United States Supreme Court has held that the government need not prove
 
 mens rea
 
 when prosecuting defendants for possessing "[illegal] drugs, ... hand grenades, ... [or] sulfuric and other dangerous acids .... [because] the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation."
 
 United States v. Int'l Minerals & Chem. Corp.,
 

 402 U.S. 558
 
 , 564-65,
 
 91 S.Ct. 1697
 
 , 1701-02,
 
 29 L.Ed.2d 178
 
 , 183 (1971) (discussing
 
 United States v. Freed,
 

 401 U.S. 601
 
 , 609,
 
 91 S.Ct. 1112
 
 , 1118,
 
 28 L.Ed.2d 356
 
 , 362 (1971) (observing that "one would hardly be surprised to learn that possession of hand grenades is not an innocent act") and
 
 United States v. Balint,
 

 258 U.S. 250
 
 , 254,
 
 42 S.Ct. 301
 
 , 303,
 
 66 L.Ed. 604
 
 , 606 (1922) (holding no
 
 mens rea
 
 is required for convictions for sales of narcotics)).
 
 See also
 

 United States v. Dotterweich,
 

 320 U.S. 277
 
 , 284-85,
 
 64 S.Ct. 134
 
 , 138,
 
 88 L.Ed. 48
 
 , 53 (1943) (upholding conviction for violation of the Food, Drug, and Cosmetic Act for shipping adulterated and misbranded drugs "even though consciousness of wrongdoing be totally wanting").
 

 The public welfare exception is limited, however, to circumstances where notice can reasonably be inferred. As the Court in
 
 Int'l Minerals & Chem. Corp.
 
 noted, like illegal drugs, grenades, and dangerous chemicals, "[p]encils, dental floss, [and] paper clips may also be regulated. But they may be the type of products which might raise substantial due process questions" were their possession criminalized in the absence of a
 
 mens rea
 
 element.
 
 402 U.S. at 564-65
 
 ,
 
 91 S.Ct. at 1701
 
 ,
 
 29 L.Ed.2d at 183
 
 . In
 
 Liparota,
 
 the Court held that a law which "declare[d] it criminal to use, transfer, acquire, alter, or possess food stamps in any manner not authorized by statute or regulations.... require[d]
 

 *519
 
 a showing that the defendant knew his conduct to be unauthorized by statute or regulations" because the act prohibited would not reasonably be assumed illegal.
 
 471 U.S. at 426
 
 ,
 
 105 S.Ct. at 2088
 
 ,
 
 85 L.Ed.2d. at 440
 
 (citations omitted).
 
 See also
 

 United States v. X-Citement Video,
 

 513 U.S. 64
 
 ,
 
 115 S.Ct. 464
 
 ,
 
 130 L.Ed.2d 372
 
 (1994) (reversing convictions under the Protection of Children Against Sexual Exploitation Act of 1977, which prohibited knowingly transporting, shipping, receiving, distributing, or reproducing a visual depiction of a minor engaging
 
 *340
 
 in sexually explicit conduct, after holding that the word "knowingly" applied to both the explicit nature of the depiction and to the age of the performers).
 

 Similarly, in
 
 Lambert,
 
 the Court discussed the due process implications of strict liability offenses.
 
 355 U.S. at 228
 
 ,
 
 78 S.Ct. at 243
 
 ,
 
 2 L.Ed.2d at 231
 
 (limiting the principle that "ignorance of the law will not excuse") (citation and internal quotation marks omitted). In that case, the Court considered the constitutionality of a provision of the Los Angeles Municipal Code that criminalized the presence in Los Angeles for more than five days of any person convicted of a felony in California unless the person registered with the police.
 

 Id.
 

 at 226-27
 
 ,
 
 78 S.Ct. at 241-42
 
 ,
 
 2 L.Ed.2d at 230
 
 . In reversing the appellant's conviction and holding the ordinance unconstitutional, the Court observed that
 

 circumstances which might move one to inquire as to the necessity of registration are completely lacking.... We believe that actual knowledge of the duty to register or proof of the probability of such knowledge and subsequent failure to comply are necessary before a conviction under the ordinance can stand.... A law which punished conduct which would not be blameworthy in the average member of the community would be too severe for that community to bear.
 
 Its severity lies in the absence of an opportunity either to avoid the consequences of the law or to defend any prosecution brought under it.
 
 Where a person did not know of the duty to register and where there was no proof of the probability of such knowledge, he may not be convicted consistently with due process. Were it otherwise, the evil would be as great as it is when the law is written in print too fine to read or in a language foreign to the community.
 

 Id.
 

 at 229-30
 
 ,
 
 78 S.Ct. at 243-44
 
 ,
 
 2 L.Ed.2d at 232
 
 (citation and internal quotation marks omitted; emphasis added).
 

 This Court has observed that
 

 Lambert
 
 has been very narrowly construed and that few cases since have been able to successfully argue its application to new facts before the Court. However, we note that each time a court has refused to apply
 
 Lambert,
 
 the defendant at hand
 
 either knew or should have known
 
 of the possible violation.
 

 *341
 

 State v. Young,
 

 140 N.C.App. 1
 
 , 12,
 
 535 S.E.2d 380
 
 , 386 (2000) (emphasis added) (discussing cases involving: distribution of child pornography,
 
 United States v. Lamb,
 

 945 F.Supp. 441
 
 (N.D.N.Y.1996) ; possession of a firearm by a person subjected to a judicial anti-stalking order or who had committed a crime of domestic violence,
 
 United States v. Meade,
 

 175 F.3d 215
 
 (1st Cir.1999) ; and possession of a firearm by a person against whom a domestic violence protective order has been obtained,
 
 United States v. Bostic,
 

 168 F.3d 718
 
 (4th Cir.1999),
 
 cert. denied,
 

 527 U.S. 1029
 
 ,
 
 119 S.Ct. 2383
 
 ,
 
 144 L.Ed.2d 785
 
 (1999) ),
 
 disc. review improvidently allowed,
 

 354 N.C. 213
 
 ,
 
 552 S.E.2d 142
 
 (2001). This observation is consistent with the United States Supreme Court case law discussed
 
 supra,
 
 to wit, that the requirement of knowledge that an act is prohibited "is particularly appropriate where ... to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct."
 
 Liparota,
 

 471 U.S. at 426
 
 ,
 
 105 S.Ct. at 2088
 
 ,
 
 85 L.Ed.2d. at 440
 
 (holding that a law which "declare[d] it criminal to use, transfer, acquire, alter, or possess food stamps in any manner not authorized by statute or regulations.... requires a showing that the defendant
 
 knew his conduct to be unauthorized by statute or regulations
 
 ") (citations omitted; emphasis added).
 

 B. Appropriateness of requiring knowledge or notice that possessing an over-the-counter medication is prohibited by law for a specific group of felons
 

 We agree with the State that methamphetamine manufacture and use is a significant
 
 *520
 
 law enforcement and public health problem which demands serious criminal penalties. However, in light of the precedent established in
 
 Lambert
 
 and
 
 Liparota,
 
 we conclude that the new subsection is unconstitutional as applied to Miller. The new subsection made it a felony for Miller to possess a pseudoephedrine product because he had a previous conviction for possession of methamphetamine. Possession of pseudoephedrine products is an innocuous and entirely legal act for the majority of people in our State, including most convicted felons. Thus, unlike selling illegal drugs, possessing hand grenades or dangerous acids,
 
 see
 

 Int'l Minerals & Chem. Corp.,
 

 402 U.S. at 564-65
 
 ,
 
 91 S.Ct. at 1701-02
 
 ,
 
 29 L.Ed.2d at 183
 
 , or shipping adulterated prescription drugs,
 
 see
 

 Dotterweich,
 

 320 U.S. at 284
 
 ,
 
 64 S.Ct. 134
 
 possessing allergy medications containing pseudoephedrine is an act that citizens, including convicted felons, would reasonably assume to be legal.
 
 See
 

 Liparota,
 

 471 U.S. at 426
 
 ,
 
 105 S.Ct. at 2088-89
 
 ,
 
 85 L.Ed.2d. at 440
 
 .
 

 Further, although we recognize that the sale and purchase of pseudoephedrine products has been regulated for many years under the CSA,
 
 see, e.g.,
 
 N.C. Gen.Stat. §§ 90-113.52A(d), 90-113.53, and that the United
 
 *342
 
 States Supreme Court has held that certain offenses which arise from conduct "a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety" can be criminalized even in the absence of notice or an explicit
 
 mens rea
 
 element,
 
 see
 

 Liparota,
 

 471 U.S. at 433
 
 ,
 
 105 S.Ct. at 2092
 
 ,
 
 85 L.Ed.2d at 444
 
 , we conclude that the existence of those very regulations only serves to highlight the violation of Miller's due process rights in the absence of notice to him of the new subsection's provisions. Under those provisions, such as the GSA's quantity limits and record-keeping requirements, before the effective date of the new subsection, anyone wishing to purchase a pseudoephedrine product from a retail store
 
 had notice
 
 of exactly what was permissible and required without violating the laws of our State, namely: (1) requesting the products from behind the pharmacy counter, (2) purchasing only approved quantities of the products, (3) showing the required identification, and (4) having the necessary personal information submitted to the NPLEx system. If, and only if, the purchaser complied with the CSA requirements would he be allowed to purchase a pseudoephedrine product. Before 1 December 2013, it was entirely legal for Miller, like any member of the general public, to purchase pseudoephedrine products in this manner. Before 1 December 2013, it was entirely legal for Miller, despite having been convicted of a methamphetamine offense, to purchase up to "3.6 grams of ... pseudoephedrine products per calendar day" and up to "9 grams of pseudoephedrine products within any 30-day period."
 
 See
 
 N.C. Gen.Stat. § 90-113.53(a) - (b).
 

 Some five weeks later on 5 January 2014, Miller followed those same procedures in order to purchase a pseudoephedrine product. The Walmart pharmacist who sold him the pseudoephedrine product obtained the product from behind the counter, ensured Miller's purchase did not exceed the quantity limits of the CSA, checked Miller's identification, and submitted the pertinent data to the NPLEx system. No stop sale alert was issued. As a result, the pharmacist believed the sale and purchase were legal, as did Miller. Indeed, for most people,
 
 including the vast majority of convicted felons,
 
 this transaction
 
 would
 
 have been legal. Simply put, there were no "circumstances which might move one to inquire as to" a significant change in the GSA's requirements nor any notice to Miller that the new subsection had transformed an innocent act previously legal for him into a felony.
 
 See
 

 Lambert,
 

 355 U.S. at 229
 
 ,
 
 78 S.Ct. at 243
 
 ,
 
 2 L.Ed.2d at 232
 
 . As such, the application of the new subsection to Miller violated his due process rights under the Fourteenth Amendment.
 

 Our holding is consistent with the 2012 decision of the Court of Criminal Appeals of Oklahoma in
 
 *343
 

 Wolf v. State of Oklahoma,
 

 292 P.3d 512
 
 (Okla.Crim.App.2012),
 
 cert. denied,
 
 - -- U.S. ----,
 
 133 S.Ct. 2797
 
 ,
 
 186 L.Ed.2d 877
 
 (2013),
 
 [6]
 
 wherein that court held that a state law very similar to the new
 
 *521
 
 subsection before us violated the appellant's due process rights.
 

 In 2010, the State of Oklahoma criminalized the possession of pseudoephedrine products pursuant to the Methamphetamine Registry Act of 2010 which
 

 establishe[d] a registry of persons convicted of various methamphetamine crimes, and applie[d] to all persons convicted after November 1, 2010, and all persons on probation for any specified offense as of that date. Upon conviction, the district court clerk [wa]s required to send the name of the offender to the Oklahoma State Bureau of Narcotics and Dangerous Drugs (OSBNDD), which maintains the registry. A person subject to the registry is prohibited from buying pseudoephedrine. Every pharmacist or other person who sells, manufactures or distributes pseudoephedrine must check the registry at each purchase, and deny the sale to any person on the list.
 

 Wolf,
 

 292 P.3d at 514
 
 . However, "the statute d[id] not provide that [district] court clerks notify any convicted person that [her] name ha[d] been submitted to the OSBNDD, or that [she was] subject to the registry" and the attendant criminal penalties for possessing pseudoephedrine.
 

 Id.
 

 at 515
 
 . The appellant in
 
 Wolf,
 
 a former methamphetamine offender who had been convicted of possessing pseudoephedrine while unknowingly subject to the registry, argued that, "[i]n order to be constitutional, the offense of unlawfully purchasing pseudo[e]phedrine while subject to the methamphetamine registry act must be construed as having a
 
 mens rea
 
 component...."
 

 Id.
 

 at 514
 
 (italics added). The state of Oklahoma, in contrast, asserted that the new law was constitutional as "a strict liability crime ... [with] no legal requirement that a person know she has violated the statute or is subject to criminal penalties...."
 

 Id.
 

 The Oklahoma court agreed that strict liability offenses could be constitutional, but explained that,
 

 when otherwise lawful conduct is criminalized, the criminal statute must provide sufficient notice for a person to know she is committing a crime
 
 .... There
 
 *344
 
 is a distinction between knowledge that one is subject to criminal penalties, and intent to commit a crime. A strict liability crime does not require any intent to commit a crime. However, due process requires notice that specific conduct is considered a criminal offense.
 

 Id.
 

 (emphasis added). The Oklahoma court then held the statute unconstitutional, reasoning that,
 

 [t]aken together,
 
 Lambert
 
 and
 
 Liparota
 
 suggest that, while a legislature may criminalize conduct in itself, with no intent requirement, the legislature must make some provision to inform a person that the conduct, as applied to her, is criminal. This is particularly important where the conduct in question is otherwise legal. This is precisely the circumstance here: some convicted felons are prohibited from purchasing pseudoephedrine, while others, along with the general population, are not.
 

 Id.
 

 at 516
 
 .
 

 We fully agree. The new subsection is unconstitutional as applied to a defendant in the absence of notice to the subset of convicted felons whose otherwise lawful conduct is criminalized thereby or proof beyond a reasonable doubt by the State that a particular defendant was aware that his possession of a pseudoephedrine product was prohibited by law.
 

 C. Distinctions and analogies to provisions in the Felony Firearms Act
 

 Before this Court, as in the trial court, the State analogizes the new subsection to our State's laws criminalizing possession of a firearm by a felon, observing that the various incarnations of those statutes have been upheld as constitutional despite the absence of any intent element or notice provision. Specifically, the State cites
 
 State v. Tanner,
 

 39 N.C.App. 668
 
 ,
 
 251 S.E.2d 705
 
 ,
 
 disc. review denied and appeal dismissed,
 

 297 N.C. 303
 
 ,
 
 254 S.E.2d 924
 
 (1979) ;
 
 State v. Coltrane,
 

 188 N.C.App. 498
 
 ,
 
 656 S.E.2d 322
 
 (2008),
 
 disc. review denied and appeal dismissed,
 

 362 N.C. 476
 
 ,
 
 666 S.E.2d 760
 
 ; and
 
 State v. Whitaker,
 

 364 N.C. 404
 
 ,
 
 700 S.E.2d 215
 
 (2010). Our review, however, reveals that these cases
 
 *522
 
 are inapposite to Miller's arguments regarding notice and intent.
 

 Our State's statutes regulating the right of convicted felons to possess firearms have undergone numerous changes since their original enactment.
 

 *345
 
 In 1971, the General Assembly enacted the Felony Firearms Act, N.C. Gen.Stat. § 14-415.1, which made unlawful the possession of a firearm by any person previously convicted of a crime punishable by imprisonment of more than two years. [Section] 14-415.2 set forth an exemption for felons whose civil rights had been restored.
 

 In 1975, the General Assembly repealed [section] 14-415.2 and amended [ section] 14-415.1 to ban the possession of firearms by persons convicted of certain crimes for five years after the date of such conviction, or unconditional discharge from a correctional institution, or termination of a suspended sentence, probation, or parole upon such convictions, whichever is later....
 

 State v. Johnson,
 

 169 N.C.App. 301
 
 , 303,
 
 610 S.E.2d 739
 
 , 741 (citations and internal quotation marks omitted),
 
 disc. review denied and appeal dismissed,
 

 359 N.C. 855
 
 ,
 
 619 S.E.2d 855
 
 (2005). In
 
 Tanner,
 
 we rejected the defendant's arguments that the amended statute was unconstitutionally vague and that the statute's
 

 classifications [were] unconstitutional [because]: (1) it denie[ed] the right to possess firearms to those convicted of certain felonies but not all felonies; (2) it allow[ed] the right of possession to some felons in the prohibited class due to the length of their sentences, probation and parole; and (3) it allow[ed] a convicted felon to possess a firearm in his home or place of business but [did] not provide a way for him to get the firearm there.
 

 39 N.C.App. at 670
 
 ,
 
 251 S.E.2d at 706
 
 . The defendant did not make, and thus this Court did not address, any arguments regarding intent or notice.
 

 "In 1995, the General Assembly amended N.C. Gen.Stat. § 14-415.1 to prohibit possession of certain firearms by
 
 all
 
 persons convicted of any felony."
 
 Johnson,
 

 169 N.C.App. at 303
 
 ,
 
 610 S.E.2d at 741
 
 (citation omitted; emphasis in original). Then, "in 2004 the General Assembly amended [ section] 14-415.1 to extend the prohibition on possession to
 
 all
 
 firearms by any person convicted of any felony, even within the convicted felon's own home and place of business."
 
 Britt v. State,
 

 363 N.C. 546
 
 , 548,
 
 681 S.E.2d 320
 
 , 321 (2009) (citation omitted; emphasis in original). This Court rejected a double jeopardy argument in
 
 Coltrane,
 

 188 N.C.App. at 504-05
 
 ,
 
 656 S.E.2d at 327
 
 , and, in
 
 Whitaker,
 
 our Supreme
 
 *346
 
 Court held that the statute as amended in 2004 was "not an impermissible
 
 ex post facto
 
 law or bill of attainder."
 
 364 N.C. at 405
 
 ,
 
 700 S.E.2d at 216
 
 (italics added). Again, in neither case did the appellant present or the appellate court consider an argument regarding the due process implications of the lack of an intent element or notice provision in the statute in question.
 

 The statute was further amended in 2006, 2010, and 2011,
 
 [7]
 
 and the current version provides:
 

 (a) It shall be unlawful for any person who has been convicted of a felony to purchase, own, possess, or have in his custody, care, or control any firearm or any weapon of mass death and destruction as defined in [section] 14-288.8(c). For the purposes of this section, a firearm is (i) any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive, or its frame or receiver, or (ii) any firearm muffler or firearm silencer. This section does not apply to an antique firearm, as defined in [section] 14-409.11.
 

 *523
 
 Every person violating the provisions of this section shall be punished as a Class G felon.
 

 (b) Prior convictions which cause disentitlement under this section shall only include:
 

 (1) Felony convictions in North Carolina that occur before, on, or after December 1, 1995; and
 

 (2) Repealed by Session Laws 1995, c. 487, s.3, effective December 1, 1995.
 

 (3) Violations of criminal laws of other states or of the United States that occur before, on, or after December 1, 1995, and that are substantially similar
 
 *347
 
 to the crimes covered in subdivision (1) which are punishable where committed by imprisonment for a term exceeding one year.
 

 .... [Provisions regarding use of records of prior convictions to prove a violation of this section]
 

 (c).... [Provisions regarding requirements for the indictment charging a violation of this section]
 

 (d) This section does not apply to a person who, pursuant to the law of the jurisdiction in which the conviction occurred, has been pardoned or has had his or her firearms rights restored if such restoration of rights could also be granted under North Carolina law.
 

 (e) This section does not apply and there is no disentitlement under this section if the felony conviction is a violation under the laws of North Carolina, another state, or the United States that pertains to antitrust violations, unfair trade practices, or restraints of trade.
 

 N.C. Gen.Stat. § 14-415.1 (2015). As with previous versions of the law, no defendant has brought forward a constitutional challenge to the present version of section 14-415.1 on grounds of lack of notice under the precedent of
 
 Lambert
 
 and
 
 Liparota.
 
 We find it relevant, however, that in holding the 2004 amendment to section 14-415.1 was unconstitutional as applied to the defendant in
 
 Britt,
 
 our Supreme Court discussed five factors, including,
 
 inter alia,
 
 the defendant's "assiduous and proactive compliance with the 2004 amendment[,]" emphasizing the defendant's knowledge that the statute had changed so as to criminalize his previously lawful conduct. 363 N.C. at 550,
 
 681 S.E.2d at 323
 
 (analyzing the statute under Article I, Section 30 of the North Carolina Constitution : "A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed.").
 

 For the reasons discussed
 
 supra,
 
 we conclude that the distinctions between the new subsection of the CSA and the provisions of the Felony Firearms Act are significant. Moreover, we find them dispositive in defeating any reliance on using our case law regarding the latter in determining the constitutionality of the former. As previously noted, the act of buying a pseudoephedrine product is innocent and legal for the general public, and, unlike possession of a firearm, legal for most convicted felons. Miller's purchase of a pseudoephedrine product after complying with the other regulations of the CSA had been legal five
 
 *348
 
 weeks before the act which resulted in his felony conviction, and, having complied as usual with those regulations, no stop sale alert was issued by the NPLEx system, such that both Miller and the pharmacist selling him the product believed his purchase was legal.
 

 Conclusion
 

 While our General Assembly is free to "criminalize conduct in itself, with no intent requirement, the legislature must make some provision to inform a person that the conduct, as applied to h[im], is criminal[,] ... particularly ... where the conduct in question is otherwise legal."
 
 See
 

 Wolf,
 

 292 P.3d at 516
 
 . We leave it to the other branches of government to determine the best manner in which to do so, whether by individually contacting the special subset of felons to whom the new subsection applies, requiring that signs regarding the provisions of the new subsection be posted at pharmacy counters, adding an informational statement to the NPLEx system, or some other method. However, as applied to Miller, the new subsection is unconstitutional because it failed to afford him sufficient notice and fair warning as required by the Due Process Clause of the Fourteenth Amendment to the United States
 
 *524
 
 Constitution, that his previously legal conduct had been criminalized. Accordingly, the trial court's judgment entered upon Miller's conviction is
 

 VACATED.
 

 Chief Judge McGEE and Judge HUNTER, JR. concur.
 

 [1]
 

 The reference to quantity limits in section 90-113.52 appears to be a clerical error as that statute includes no quantity limits on sales, but rather specifies other regulations for the sale of pseudoephedrine products, such as age restrictions and a requirement that those products be stored behind the pharmacy counter.
 
 See
 
 N.C. Gen.Stat. § 90-113.52 (2013). However, section 90-113.53, entitled "Pseudoephedrine transaction limits[,]" does specify daily and monthly quantity limits on the delivery and purchase of pseudoephedrine products.
 
 See
 
 N.C. Gen.Stat. § 90-113.53 (2013) (limiting sales to 3.6 grams per calendar day and 9 grams in any 30-day period).
 

 [2]
 

 On 3 October 2012, a judgment was entered upon Miller's conviction on one count each of possession of a methamphetamine precursor and maintaining a vehicle or dwelling for sale or delivery of a controlled substance. The trial court imposed a sentence of 16 to 20 months, suspended the sentence, and placed Miller on 36 months of supervised probation.
 

 [3]
 

 We recognize that any possession of a controlled substance offense contains an implied
 
 knowledge
 
 element, to wit, that the defendant must know he possesses the controlled substance and must also know the identity of the substance.
 
 See
 

 State v. Galaviz-Torres,
 

 368 N.C. 44
 
 , 52,
 
 772 S.E.2d 434
 
 , 439 (2015) ("[F]or the defendant to be guilty [of possession of a controlled substance], he had to both knowingly possess a substance and know that the substance that he possessed was the substance that he was charged with possessing.") (discussing
 
 State v. Coleman,
 

 227 N.C.App. 354
 
 ,
 
 742 S.E.2d 346
 
 ,
 
 disc. review denied,
 

 367 N.C. 271
 
 ,
 
 752 S.E.2d 466
 
 (2013) ). Here, Miller does not dispute that he knew he was buying a pseudoephedrine product. However, the act criminalized by the new subsection is not merely possessing a pseudoephedrine product, an undertaking that is entirely legal for most citizens of our State, but rather possessing a pseudoephedrine product while prohibited by law from doing so on the basis of a past methamphetamine conviction. This is an entirely different situation from possession of controlled substances, which is illegal for
 
 all
 
 citizens. Thus, we reject the State's assertion that the new subsection is "a straightforward criminal statute prohibiting possession of a controlled substance by a person with a prior conviction for the possession or manufacture of methamphetamine."
 

 [4]
 

 Although not pertinent to this appeal, we note that our General Assembly has since amended the new subsection. Session Law 2014-115, s.41(a) made a minor stylistic change in subdivision (d1)(1)(c) and rewrote the undesignated paragraph of that subdivision. Session Law 2015-32, s.1, effective 1 December 2015,
 
 inter alia,
 
 expanded the list of previous convictions in the first sentence of subdivision (d1)(1)(c) to include "possession with the intent to sell or deliver methamphetamine, sell or deliver methamphetamine, trafficking methamphetamine, possession of an immediate precursor chemical" and added a second sentence to the subdivision: "The prior conviction may be from any jurisdiction within the United States."
 

 [5]
 

 In this regard, we are in full accord with the State, which argued consistently and vigorously both at trial and on appeal that the crime defined in the new subsection does
 
 not
 
 include any element of intent.
 

 [6]
 

 Although not binding on this Court, we find the reasoning of our sister court highly persuasive.
 

 [7]
 

 In 2006, subsection (a) was amended to exempt antique firearms from the law.
 
 See
 

 2006 N.C. Sess. Laws 259
 
 , s.7(b). Session Laws 2010-108, s.3, as amended by Session Laws 2011-2, s.1 added subsections (d) and (e). Session Laws 2011-268, s.13,
 
 inter alia,
 
 rewrote subsection (d), which formerly read: "This section does not apply to a person whose firearms rights have been restored under [section] 14-415.4, unless the person is convicted of a subsequent felony after the petition to restore the person's firearms rights is granted." Other amendments made in 2010 and 2011 relate to communication with federal law enforcement agencies and to the applicability of amended provisions to offenses committed on or after specific dates.